## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Jane Doe,

       Plaintiff,

-V-                                   **Case No. 2:04 -CV- 0307**
                                                **JUDGE SMITH**
                                                **Magistrate Judge Abel**

The Ohio State University Board
of Regents, *et al.*,

       Defendants.

### OPINION AND ORDER

Plaintiff asserts that the Defendant deprived her of access to educational opportunities in violation of Title IX of the Education Act of 1972, 20 U.S.C. § 1681(a), because Defendant The Ohio State University ("OSU") acted with deliberate indifference when Jeremy Goldstein sexually assaulted another student and later raped Plaintiff.  Plaintiff also brings a common law negligence claim.[1]

OSU moves for summary judgment (Doc. 32).  For the reasons that follow, the Court grants OSU's Motion for Summary Judgment.

---

[1] This case was originally filed in the Northern District of Ohio and also named Jeremy Goldstein as a Defendant, however, Plaintiff later dismissed her claims against Mr. Goldstein with prejudice.   Plaintiff also filed a similar lawsuit in the Ohio Court of Claims on February 13, 2004, *Doe v. Ohio State University Board of Regents, et al.*, case number 2004-02296.  That case remains pending, but has been stayed pending the outcome of this federal litigation.

## I.   FACTS

In the fall of 2001, Plaintiff and Jeremy Goldstein both enrolled at OSU as freshmen. Prior to this time, Plaintiff and Mr. Goldstein were high school friends from Beechwood, Ohio. A relationship developed between Plaintiff and Mr. Goldstein toward the end of their senior year in high school and during their freshman year in college.  This relationship developed into a consensual sexual relationship.

On February 3, 2002, another student at OSU ("Ms. Lee")  reported that she and Jeremy Goldstein, a fellow Baker Hall resident, were having a conversation in her room when he tried to remove her clothes and to forcibly have sex with her.  (Lee Aff. ¶ 3 & Aff. Ex. A).  Mr. Goldstein left the room, but later returned.  Mr. Goldstein invited her to a Super Bowl party later that evening and she agreed to go.

After she returned home from the party, Ms. Lee talked with her Resident Advisor at Baker Hall and wrote a Communication Information Form ("CIF") describing the incident.  Ms. Lee did not describe a completed sexual assault in the CIF, but rather, an attempted one.  (See Lee Aff. Ex. A).  Ms. Lee also stated that Mr. Goldstein was drunk at the time.  (Orefice Aff. ¶ 5).  Brian Orefice, the Baker Hall Director, encouraged Ms. Lee to report the incident to the police.  (Orefice Aff. ¶ 6).  Ms. Lee told Mr. Orefice that she had talked with her father and that she would file a police report.  (Lee Aff. ¶ 4).

In the days following February 3, 2002, Mr. Orefice conducted an investigation which he reported on the CIF, including interviews with Ms. Lee and Mr. Goldstein.  Mr. Orefice also talked with Ms. Lee about her options within the University.  (Lee Aff. ¶ 4; Orefice Aff. ¶ 6). Ms. Lee stated that her objectives were to have Mr. Goldstein removed from her dormitory, to

have the incident documented, and to perhaps reconcile her friendship with Mr. Goldstein.  (Lee Aff. ¶¶ 5, 6).  OSU temporarily removed Mr. Goldstein from Baker Hall on or about February 5, 2002, and reassigned him to Smith Hall.  (Orefice Aff. ¶ 6).

On February 11, 2002, Ms. Lee filed a police report which provided different details than those reported in her CIF.  (Orefice Aff. ¶ 4; Klein Dep. at 114; Hollern Aff. ¶ 6).  Four days later, on February 15, 2002, Ms. Lee notified OSU police via e-mail that "this is as far as I wish to pursue the case."  (Lee Aff. ¶ 7 & Aff. Ex. B).  Ms. Lee told Mr. Orefice that she had decided that she wanted to leave open the possibility of maintaining a friendship with Mr. Goldstein, and asked Mr. Orefice to facilitate her contacting Mr. Goldstein on her own terms and in her own time.  Later that spring, Ms. Lee did in fact call Mr. Goldstein in an effort to restore the friendship.  (Lee Aff. ¶ 6).

Ms. Lee's report to police was logged on the OSU Campus Security Report as a sexual assault, and it was reported in the police blotter of a campus paper on February 20, 2002.  (Hollern Aff. ¶ 6; Doe 11/01 Dep. at 65-67 & Ex. 23).  OSU did not issue a campus crime alert or warning about Mr. Goldstein to the campus or general public, as such a warning is not a substitute for arrest and prosecution (Hollern Aff. ¶ 5), and was inconsistent with the wishes expressed by Ms. Lee.

On February 26, 2002, based on this incident, Ohio State charged Mr. Goldstein with sexual misconduct and an alcohol violation under the Code.  Taking into account Ms. Lee's wishes as to both forum and possible sanction, a hearing was held before a Residence Life Hearing Officer.  Mr. Goldstein waived notice and a formal hearing, and Mr. Orefice conducted an administrative hearing the same day.

Mr. Orefice found that Mr. Goldstein had committed sexual misconduct and violated the alcohol provision of the Code.  (Orefice Aff. ¶ 9).  Mr. Orefice placed Mr. Goldstein on disciplinary probation until June 14, 2002, made his housing re-assignment permanent, and required that he be "open to" Ms. Lee "approaching him to discuss the situation but on her own terms."  *(Id.).*  Mr. Goldstein did not appeal.

On the evening of the next day, February 21, 2002, Plaintiff went to a bar in downtown Columbus with friends and had two or three beers.  She and her friends returned to campus around 1:00 a.m.  (Doe 10/19 Dep. at 239-49).  Rather than returning to her own dormitory, Plaintiff went to Smith Hall with one of her friends.  That friend decided to go to bed because she had class the next morning. (*Id.* at 252).  Plaintiff testified, "I went on her computer . . . [t]o find people to hang out with." (*Id.* at 253).  She began to exchange "instant messages" with Mr. Goldstein. (*Id.* at 253-54).  Plaintiff and Mr. Goldstein agreed to meet outside of Smith Hall to share a cigarette. (*Id.* at 257).

Once outside, Mr. Goldstein told Plaintiff that he had forgotten his cigarettes and suggested that they go up to his room. (*Id.* at 260).  Plaintiff told Mr. Goldstein that she was not interested in sex that night, ("I told him . . . you know we're not going to hook up tonight") but she agreed to go to his room. (*Id.* at 260-61).  They spent about twenty to twenty-five minutes total in the room. (*Id.* at 266-67). Throughout that time, Mr. Goldstein's roommate was present either asleep or, as Plaintiff believes, "passed out." (*Id.* at 264).  After about ten to fifteen minutes of talking and smoking, Plaintiff and Mr. Goldstein sat on the couch and began intimate contact that was at first consensual. (*Id.* at 267-73).  Plaintiff then describes the sexual assault in detail during her deposition:

A.  While he was kissing me, he-I ended up-he pushed me on my back, just with his chest by his own force of just being aggressive.  And his, at this point, his tongue was, like, choking me.  He then took my hands and put them above my head, which were like resting on the armrest of the-like I remember feeling-my arms were on the arm rest of the couch behind me.  Then he started pulling my ears, I think as far as they would go, with his teeth.  And then he took one of his hand-his hands were holding mine above me and he took one of his hands and continued holding them above me, on the other one he put down my pants and he put what felt like a fist inside me.  And then I was in severe pain instantly, and began to gasp for air.  And while I was making those kind of noises, like-my breath had been taken away from me or something, like I couldn't breath, he was whispering in my ear how much I loved it and was enjoying it and like, o, I knew you'd like it.

Then he took both of this hands and pulled down my pants and quickly, very quickly, put both my hands together above my head.  And at this point, we were fully clothed with my pants just pulled down and his pants just opened up.  And he started having sex with me.  And I told him to get the fuck off me.  And he just did it harder and he was using his hands as, like leverage, I guess you could say.  And every time I said get the fuck off me, he did it even harder.

(Pl. Depo. at 268-270).

Later on February 22, Plaintiff called a male friend who was an OSU student, went to his fraternity house, and reported the events.  (Doe 10/19 Dep. at 292).  He told Plaintiff that she needed to report it, and she admits she was reluctant to do so. (*Id.* at 293).  Eventually, Plaintiff agreed that she would tell the Hall Director at Stradley Hall. (*Id.* at 293-94).  Plaintiff and her friend left his fraternity and found Leon Stevenson, the Assistant Hall Director of Stradley Hall. (*Id.* at 299).  Mr. Stevenson took notes of the conversation and suggested that they call the police. Mr. Stevenson then left the room to call Jennifer Klein, Assistant Director of Residence Life. (Stevenson Aff. ¶ 5).

Mr. Stevenson did not use the names of the persons involved when talking with Ms. Klein.  Ms. Klein advised Mr. Stevenson over the phone of information and resources to provide to Plaintiff.  (Klein Aff. ¶ 2; Stevenson Aff. ¶ 5).  Mr. Stevenson urged Plaintiff to allow

him to call the police and she agreed.  (Doe 10/19 Dep. at 304-05).  Ohio State police officer

Pamela Temple responded.  (Stevenson Aff. ¶ 6; Temple Aff. ¶ 2).  Mr. Stevenson and Officer

Temple recall that Plaintiff was reluctant to report the incident, and specifically that she did not

provide them with the last name of the alleged assailant. (Stevenson Aff. ¶ 5; Temple Aff. ¶ 2).

Plaintiff testified that she "is not sure" whether she provided the full name. (Doe 10/19 Dep. at

319).[2]  The CIF that Mr. Stevenson prepared following Plaintiff's report shows that Plaintiff

mentioned only the first name, "Jeremy."  (Stevenson Aff. Ex. A).  Plaintiff testified: "[Officer

Temple] asked me if I wanted to file a police report, and I asked her do I have to do it now . . . . I

think she said something like you have 19 months or 18 months or something like that, of that

nature." (Doe 11/01 Dep. at 77).

Officer Temple recalls telling Plaintiff that she could file a report later if that is what she

wanted to do. (Temple Aff. ¶ 2).  As Plaintiff admits, Officer Temple advised her of various

options.  (Doe 10/19 Dep. at 318).  Officer Temple recalls that they discussed counseling and

support services, and that Plaintiff told her she was already seeing a counselor at OSU and had a

scheduled appointment coming up. (Temple Aff. ¶ 2).  Plaintiff does not remember telling them

she was already in counseling, (Doe 10/19 Dep. at 325-26), but admits, "I may have" (Doe 11/01

Dep. at 104).  Plaintiff told Mr. Stevenson and Officer Temple that she wanted time to think

about her options. (Temple Aff. ¶ 2; Stevenson Aff. ¶ 6).  Plaintiff agrees that, on that day, she

felt uncertain about what she wanted to do. (Doe 11/01 Dep. at 73-74).  Officer Temple gave

---

[2] In her brief, Plaintiff now states that she did provide Mr. Goldstein's last name and that
Stevenson just did not write it down.  Even if the name was not provided, thee was enough
information provided including his first name Jeremy and that he lived on the eighth floor of
Smith Hall in a temporary room.

Plaintiff a yellow business card with contact information and wrote her name on the reverse side, (Temple Aff. ¶ 2) although Plaintiff now denies receiving the card.  (Doe 10/19 Dep. at 95).

Plaintiff does acknowledge that, if she wanted to talk with Officer Temple again, she could have asked Mr. Stevenson to contact her. (Doe 11/01 Dep. at 78).  Plaintiff also acknowledges that Mr. Stevenson and Officer Temple treated her with respect, listened to her, seemed interested and fairly concerned, and took her seriously when she made the report on February 22, 2002. (Doe 10/19 Dep. at 301; Doe 11/01 Dep. at 76-77).

Mr. Stevenson took contemporaneous notes of the conversation with Plaintiff, and later recopied his notes onto a CIF dated February 27, 2002. (Stevenson Aff. Ex. A). The CIF does not record the full name of the alleged assailant, because Plaintiff did not disclose it. Mr. Stevenson's report states as follows:

> [Plaintiff] said that she wanted to think about and hear all of her options. Leon told her about the services the Residence Education department could provide. She said that she wanted to hear what support and services the police would provide. She then asked Leon to call the police. Officer Pam arrived and told [Plaintiff] of the different options available to her. She [Plaintiff] said that she needs some alone time to think about what she wanted to do. [Her] ultimate goal was to have the incident documented so that if he acted this way toward another woman his history would speak for itself. While discussing the entire situation, [she] said the guy's name was Jeremy and that he lived in Smith, in a temp room. At this time [Plaintiff] said she wanted to go to her room to think about what decision she was going to make.

(*Id*.). Plaintiff acknowledges the substantial accuracy of the information recorded in this CIF. (Doe 10/19 Dep. at 310-14).

Mr. Stevenson recalls that he checked with Plaintiff after February 22, 2002, and that she led him to believe she was doing fine. (Stevenson Aff. ¶ 8).  Plaintiff acknowledges that she saw

Mr. Stevenson in the dormitory from time-to-time after February 22, but she never sought him out or said she needed to talk with him. (Doe 11/01 Dep. at 102-03).

On March 7, 2002, Jenny Klein, Assistant Director of Residence Life, held a staff meeting with her Hall Directors. (Klein Dep. at 61). At that time, the possibility was raised that Jeremy Goldstein, the subject of the Baker Hall incident with Ms. Lee, might be the same "Jeremy" involved with Plaintiff. (*Id.* at 76-77; Klein Aff. ¶ 3). A staff member checked a recent roster of Smith Hall, leading Ms. Klein to further suspect that the two incidents might involve the same person. (*Id.*). Out of respect for Plaintiff's privacy, and her expressed desire for more time to decide what she wanted to do, Ms. Klein did not confront Plaintiff. (Klein Aff. ¶ 3). Instead, Ms. Klein consulted her superiors and decided to schedule a meeting directly with Mr. Goldstein to learn more information. (Klein Dep. at 61-64). Mr. Goldstein was located and an appointment made for March 13, 2002. (Id.). Mr. Goldstein's mother also attended the March 13, 2002 meeting. (Klein Aff. ¶ 3).

That same day, March 13, 2002, the Office of Residence Life received reports that Mr. Goldstein recently had been in a fight with male students, that he had shouted derogatory names at women, and that he had pushed one woman against a wall. (Klein Aff. ¶ 4). In fact, students were writing up CIFs describing these allegations at the same time as Ms. Klein's March 13, 2002 appointment with Mr. Goldstein. (Treboni Dep. at 19-20, 25-26). When he met with Ms. Klein, Mr. Goldstein was bruised. (Klein Aff. ¶ 4). As Mr. Goldstein was already on probation as a result of the February 26th hearing on Ms. Lee's incident, Ms. Klein opted to convert the March 13th meeting into an administrative hearing. (Klein Aff. ¶ 4). Mr. Goldstein

-8-

admitted to using alcohol in violation of University policy and his probation.  Ms. Klein found him responsible for violating the alcohol provisions of the Code and immediately terminated his housing contact, which is the maximum sanction available for violations found by Residence Life.  (Klein Dep. at 64; Klein Aff. ¶ 4).  Ms. Klein also banned him from south campus dormitories, which included Stradley Hall.  As Mr. Goldstein had final exams over the next four days, Ms. Klein required Mr. Goldstein to vacate Smith immediately, but permitted him temporary access to a room in Morrill Tower with termination of his housing contract effective immediately after his last final. (Klein Aff. ¶ 4).

From February 2002, until June 2002, Plaintiff did nothing to pursue charges or to report any information about Mr. Goldstein to Ohio State authorities.  During those four months, Plaintiff failed to appear for three scheduled appointments with Dr. Mitsak. Her excuse for missing these counseling sessions was unrelated to the alleged assault; rather, she reported that she missed the March 13th appointment to attend the funeral of a friend's mother; she missed the April 24th appointment to go visit the same friend; and she missed the May 28th appointment with no explanation given.  (Mitsak Dep. at 80-83, 88).  In April 2002, however, Plaintiff contacted CCS to obtain a refill of her Prozac prescription. (*Id.* at 90).

With the help of her academic advisor, Plaintiff withdrew from all of her classes as of May 17, 2002 (Doe 11/01 Dep. at 137-38), which meant that she spent one month on campus without attending class, that is, until her mother picked her up to go home for the summer. Plaintiff did not tell her mother she had withdrawn from all her classes; instead, her mother assumed when she came to pick her up that she was still seeing Dr. Mitsak, had continued to attend classes, and had gone to the hospital after the alleged assault. (Mother Dep. at 106-07).

About a week before her mother arrived on campus, on June 6, 2002, Plaintiff finally returned to see Dr. Mitsak. She told him then, for the first time, that she had been raped "about two months ago" by a person that she knew. (Mitsak Dep. at 90-92). She also told him that she had already filed charges and that her parents were coming the next day (June 7th) to pursue the case—which turned out was not truthful. (Mitsak Dep. at 94-95).

On June 14, 2002, the last day of spring quarter and graduation day, Plaintiff and her mother went to the Ohio State Police and asked to make a police report. (Doe 11/01 Dep. at 143; Doe Dep. Ex. 26). For the first time, Plaintiff provided Mr. Goldstein's full name and other information about him. (*Id.* at 231). In describing the events, Plaintiff lied to Officer Conway, telling him that she had gone to the hospital, that a sexual assault kit had been performed, and that she had told the employees at the hospital she didn't want any information released – all of which she now admits were false statements. (*Id.* at 151-53). She also told him, erroneously, that a Columbus police officer had responded. (*Id.* at 149). Plaintiff told Ohio State Police that she was coming forward now because she learned Mr. Goldstein may have harmed other women – some of which information she claims to have learned the very day of the alleged assault in February. (*Id.* at 148). After filing charges with the Ohio State Police on June 14, 2002, Plaintiff and her mother then drove home to Beechwood, Ohio, Mr. Goldstein's hometown as well, where she stayed for the summer. (*Id.* at 114-15).

About one month later, on July 11, 2002, Plaintiff returned to Columbus to be interviewed by OSU Police. She made no contact with the police between June 14th and July 11th other than to schedule the July appointment. (Doe 11/01 Dep. at 167). An audiotape of the July 11th interview was made and has been authenticated by Ms. Doe during her deposition. (*Id.*

at 117-18).  Plaintiff disclosed for the first time during the July 11th interview that she had not sought medical treatment after the assault. Before that, she knew that the OSU Police would take steps to look for the non-existent hospital records, but she had no substantive contact with them to correct her falsehoods between June 14th and July 11th.  (*Id.* at 153, 156).  Plaintiff provided names and contact information for witnesses, many of whom were students who were away from campus for the summer and who did not return phone calls from the investigating officers. (*Id.* at 168-69; Hollern Aff. ¶ 2).  Plaintiff is aware that a number of witnesses she named to the police did not want anything to do with the investigation. (Doe 11/01 Dep. at 169).  Despite these obstacles, the OSU Police completed their investigation in late August 2002 and sent a felony case summary to the Franklin County Prosecutor on September 1, 2002. (Hollern Aff. ¶ 2).

OSU Police offered to help Plaintiff complete a civil protection order to guard against any contact by Mr. Goldstein. (Doe 11/01 Dep. at 201; Hollern Aff. ¶ 2).  Lieutenant Hollern delivered the forms to Plaintiff and offered assistance. However, Plaintiff never completed the forms. (*Id.*).  Plaintiff admits that she was able to walk past Mr. Goldstein's off-campus apartment in the Fall of 2002 without undue fear. (Mitsak Dep. at 120).

After OSU Police sent the case to the Franklin County Prosecutor's Office in September 2002, Plaintiff and others at OSU were under the impression, based on information from the Prosecutor's Office, that the matter would go to the grand jury in two or three months. (Doe 11/01 Dep. at 190-91 & Dep. Ex. 28).  However, the criminal proceedings took much longer. Plaintiff does not claim that OSU had any control over the timing of the work done by the Franklin County Prosecutor's Office. (*Id.* at 195).  The case was presented to the grand jury in

June 2003, and an indictment against Ms. Goldstein was returned on June 13, 2003. (*Id.* at 267-68). The criminal case took another sixteen months, until October of 2004, when the rape charges were dismissed pursuant to a plea bargain to a misdemeanor.

On October 2, 2002, after returning to campus for the fall quarter, Plaintiff met with the Director for Student Judicial Affairs, Pat Hall, to explore pursuing a university judicial hearing. (Doe 11/01 Dep. at 207, 210-11). Mr. Hall explained the applicable code sections and the judicial hearing process to Plaintiff in great detail. (Hall Dep. at 72-73; Doe 11/01 Dep. at 210-11). Mr. Hall also referred Plaintiff to the REPP office for counseling. (*Id.* at 209-10).

The next day, October 3, 2002, Plaintiff saw her psychiatrist, Dr. Mitsak, and reported that she "had received a good deal of support" from the Office of Judicial Affairs. (Mitsak Dep. at 117-18). Also on October 3rd Plaintiff met with Ms. Schipper in OSU's REPP office, who became her advocate in both the University and criminal proceedings. (Schipper Dep. at 46-47; Doe 11/01 Dep. at 190-91). Ms. Schipper and Mr. Hall told Plaintiff that it was "her decision" whether to pursue a hearing to seek Mr. Goldstein's dismissal from the University. (*See* Doe 11/01 Dep. at 235-41; Doe Dep. Ex. 30: "So once again, it is up to you to decide . . . . You can decide to go ahead as soon as possible, wait until after the Grand Jury hearing, or drop the whole thing."); Hall Dep. at 68-69; Schipper Dep. at 45-48). In considering this decision, Plaintiff discussed with Ms. Schipper and Mr. Hall the potential disadvantage of giving Mr. Goldstein "free discovery" if a university judicial proceeding were to take place prior to the grand jury hearing. (Schipper Dep. at 45-48; Doe 11/01 Dep. at 211). On Plaintiff's behalf, Ms. Schipper also sought advice from prosecuting attorney Angela Canepa, who is in charge of the Franklin County Prosecutor's Abuse Unit that handles rape cases, and then passed along the

advice to Plaintiff in an e-mail as follows: "I told her about your case and asked about the advisability of waiting until after the Grand Jury, before going ahead with Judical [sic] Affairs, and she said that it is a good idea to wait, for the same reasons that Pat Hall gave, that we don't want to give the bad guy any more information for his defense." (Doe 11/01 Dep. at 255; Doe Dep. Ex. 33).

Plaintiff told Pat Hall on November 25, 2002, that she had decided to wait for an indictment. (Doe 11/01 Dep. at 249; Hall Dep. at 120).  Plaintiff had no further contact with the Office of Student Judicial Affairs until June 17, 2003. On that date, she sent an e-mail to Mr. Hall which read:

> I hope that you remember me. My name is [Plaintiff] and I came to you at the beginning of the year (right around the time of the riots) to report to you that I had pressed charges on Jeremy Goldstein. I agreed with you when you advised me to wait upon the school hearing until legal actions were persued [sic]. Well, they were. I will be coming back to columbus [sic] for the summer quarter in a few days, and I was wondering if I could meet with you to discuss this matter. I appreciate your time.

(Doe Dep. Ex. 36).

On June 17, 2003, Plaintiff notified Pat Hall and Ms. Schipper that on June 13th an indictment was returned against Mr. Goldstein on the rape charges. (Doe Dep. Ex. 35, 36).  The next day, June 18th  Mr. Hall responded and told Plaintiff to schedule an appointment with his office.  (Doe Dep. Ex. 36).  Plaintiff waited another three weeks, until July 8, 2003, before calling to schedule the appointment. (Hall Dep. at 116).  Mr. Hall set the appointment the very next day, on July 9, 2003. (*Id.*; Doe 11/01 Dep. at 276, 282).  At the meeting, Plaintiff, Mr. Hall, and Ms. Schipper discussed the university judicial process. (Doe 11/01 Dep. at 282-83).

Meanwhile, following the June 13th indictment, the Franklin County Prosecutor's Office had not taken steps to have Mr. Goldstein arrested or to notify OSU. (Doe 11/01 Dep. at 296; Hollern Aff. ¶ 7). On Plaintiff's behalf, Ms. Schipper contacted the Ohio State Police to find out why an arrest warrant had not been served as of July 11, 2003. (*Id.* at 294-95; Hollern Aff. ¶ 7). As a result of Ms. Schipper's efforts and arrangements by Lieutenant Hollern, Mr. Goldstein was arrested, but then he was released on bond. (Doe 11/01 Dep. at 297-302; Dep. Exs. 37, 38; Hollern Aff. ¶ 7).

On August 8, 2003, Mr. Hall sent Mr. Goldstein a letter notifying him of the charges brought by Plaintiff under the Code of Student Conduct. (Hall Dep. at 116). From August 8, 2003, until the date of the hearing on September 23, 2003, Mr. Hall arranged for a full judicial panel to be on campus for the hearing, contacted witnesses, met with Plaintiff and her father, and met with Mr. Goldstein and his attorneys to ensure that his due process rights were met.[3] (Hall Dep. 29-30; Doe 11/01 Dep. at 289-92). With Ms. Schipper's help, Plaintiff prepared a list of sixteen witnesses she wanted to have at the hearing. (Doe 04/08 Dep. at 501-04; Doe Dep. Exs. 47, 48). The Office of Judicial Affairs has no subpoena power, but Mr. Hall did contact witnesses to encourage their attendance. Because Plaintiff wanted to have Ms. Lee testify, Mr. Hall began calling Ms. Lee on August 8, 2003, again on August 26th and finally he spoke with her on August 27th about attending the hearing. (Hall Dep. at 28-30). Ms. Lee told

---

[3] Also during this time, Plaintiff sought to have Mr. Goldstein suspended on an interim basis pursuant to the Code of Student Conduct. On August 24, 2003, Plaintiff contacted Mr. Hall and they met on August 26th. Based on the concerns expressed by Plaintiff and the June 2003 indictment, Mr. Hall placed Mr. Goldstein on interim suspension following the August 26th meeting.

Mr. Hall she would participate, but only if the hearing took place on September 22nd or 23rd. (*Id.* at 30). As it turns out, Ms. Lee chose not to appear. (Lee Aff. ¶ 9).

The hearing was held as scheduled on September 23, 2003. At the hearing, Pat Hall permitted Plaintiff to say what she wanted and to introduce hearsay evidence of other bad acts of Mr. Goldstein in the hearing. Mr. Goldstein, however, did not testify, asserting his Fifth Amendment rights. (Doe 11/01 Dep. at 205). The hearing concluded in one day. The hearing panel's ultimately decided to dismiss Mr. Goldstein permanently, the ultimate sanction that OSU can impose on a student. (Doe 10/19 Dep. at 90). Plaintiff was satisfied with that decision. (Doe 04/08 Dep. at 492). Mr. Goldstein's appeal thereafter was denied, which likewise pleased Plaintiff. (Doe 11/01 Dep. at 229-30).

In October 2004, more than a year after OSU had permanently dismissed Mr. Goldstein as a student, Mr. Goldstein pled guilty to a misdemeanor charge of sexual imposition pursuant to a plea agreement which dismissed the rape charges. Mr. Goldstein was sentenced to probation with no jail time. Plaintiff consented to the plea agreement. (Doe 10/19 Dep. at 93; *see* Certified Transcript of Proceedings 10/04/04, in *State v. Goldstein*, Case No. 03 CR-06-4067).

## II.  SUMMARY JUDGMENT

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby*, *Celotex*, and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary

-16-

judgment.'" *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257).  The nonmoving party must adduce more

than a scintilla of evidence to overcome the summary judgment motion.  *Id.*  It is not sufficient for

the nonmoving party to merely "'show that there is some metaphysical doubt as to the material

facts.'"  *Id.* (*quoting Matsushita*, 475 U.S. at 586).

     Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that

it is bereft of a genuine issue of material fact." *Id.* at 1479-80.  That is, the nonmoving party has an

affirmative duty to direct the court's attention to those specific portions of the record upon which it

seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir.

2001).

## III.   DISCUSSION

     Plaintiff Jane Doe claims that Defendant OSU subjected her to severe harassment which

deprived her of her access to educational opportunities or benefits in violation of Title IX of the

Education Act of 1972, 20 U.S.C. § 1681(a).  Plaintiff also asserts a claim of negligence for failure

to follow or enforce safety rules and guidelines, failing to warn students, and for permitting Mr.

Goldstein to circulate throughout the campus.  (Compl. ¶¶ 7-17, 19-25).  Title IX provides, in

relevant part, that "no person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

     Title IX does not explicitly provide a private remedy; therefore, courts have provided an

implied private right of action for monetary damages.  *See Gebser v. Lago Vista Indep. Sch. Dist.*,

524 U.S. 274, 280, 284 (1998).  Defining the scope of that right of action, the Supreme Court has

held that sexual harassment of a student in a federally funded educational program, if perpetrated

by a teacher or other employee of the funding recipient, can render the recipient liable for damages under Title IX. *See Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 76 (1992). The Supreme Court has also held that student-on-student harassment may support a claim for monetary damages. *See Davis*, 526 U.S. at 650. In these instances, the institution may be both discriminating and, by its lack of response, denying participation. Either may rise to a Title IX violation. Plaintiff brings her Title IX claim based on student-on-student sexual harassment.

Title IX defendants are often referred to as "recipients" or "funding recipients" because their liability is based on their receipt of federal funds. The government's Title IX enforcement power may be exercised only against a funding recipient, and liability for damages in a private suit under Title IX is limited to funding recipients. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 653 (1999). It is undisputed that Defendant OSU is a recipient of federal education funding or federal financial assistance, and is therefore a funding recipient and subject to Title IX.

In order to establish a claim based on student-on-student sexual harassment under Title IX, Plaintiff must demonstrate that: 1) the alleged harassment was so "severe, pervasive and objectively offensive" that it deprived Plaintiff of "access to the educational opportunities or benefits provided by the school"; 2) the funding recipient had "actual knowledge" of the sexual harassment; and 3) the funding recipient was deliberately indifferent to the harassment." *Davis*, 526 U.S. at 629.

**1.     Sexual Harassment**

There does not appear to be any dispute that the sexual assault described by Plaintiff constitutes severe and objectively offensive sexual harassment, satisfying the first element of the *Davis* test. Defendant OSU does not even discuss the first element, but rather begins with the second element, actual knowledge. Plaintiff does address the severity of the sexual harassment in

-18-

her brief.  (Pl's Memo. in Opp. at 21).  Plaintiff describes her attitude and actions after the sexual assault to show severity.  The Court is not sure how her claims that she stopped going to classes and failed a class show severity.  Nonetheless, the Court finds that the first element has been satisfied based on the sexual assault on Plaintiff.  *See Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (holding that where there is evidence in the record to support an assertion that a student was raped, sexually abused, or harassed, such conduct obviously qualified as being severe, pervasive, and objectively sexual harassment that could deprive a student of access to the educational opportunities provided by her school).

**2.      Actual knowledge of the sexual harassment**

Defendant argues that it did not have actual knowledge that Mr. Goldstein posed a threat to Plaintiff.  Plaintiff, however, argues that OSU was "smothered in actual knowledge" of both the alleged sexual harassment and that Mr. Goldstein posed a threat to Plaintiff.  (Pl's Memo. in Opp. at 22).  Despite Plaintiff's arguments to the contrary, Plaintiff has failed to establish that OSU had actual knowledge of the sexual harassment or potential harm to Plaintiff prior to the sexual assault on her on February 22, 2002.

The Supreme Court has declined to apply a constructive-knowledge standard, demanding actual knowledge of sexual harassment in Title IX cases of teacher-on-student harassment.  *See Gebser*, 524 U.S. at 284-290.  The Supreme Court has unequivocally imported the actual-knowledge standard into cases of student-on-student harassment. *See Davis*, 526 U.S. at 646-47. The Sixth Circuit has followed the Supreme Court's lead in requiring actual knowledge of student-on-student sexual harassment in Title IX cases.  *See Vance v. Spencer County Public School District*, 231 F.3d 253, 258-59 (6th Cir. 2000).

On February 22, 2002, the day of Plaintiff's sexual assault, Defendant OSU was aware of the following: Ms. Lee had complained that Mr. Goldstein had attempted to force her to have sex, that she documented the incident, that Mr. Goldstein was removed from her dormitory at her request, and that Ms. Lee wanted to reconcile her friendship with Mr. Goldstein.  Ms. Lee did not want to press criminal charges, nor did she proceed with a Judicial Affairs hearing.  Further, Mr. Goldstein denied Ms. Lee's allegations to Mr. Orefice who was investigating.  Mr. Orefice did schedule an administrative hearing, but that was not held until February 26, 2002, at which time Mr. Goldstein was found to have committed sexual misconduct and an alcohol violation.

The facts of this case differ from those in *Davis*, in which the actual notice standard was satisfied by repeated reports of the harassing conduct to the teacher and principal by both the student and her mother.  *Davis*, 526 U.S. at 645-647.  Defendant OSU was not notified with respect to any harassment against Plaintiff until after the incident of sexual assault occurred on February 22, 2002.  Nonetheless, OSU could have had actual notice based on the attempted sexual assault on Ms. Lee.  However, as illustrated in detail in the facts and summarized above, at the time of the sexual assault on Plaintiff, there were no definite findings against Mr. Goldstein.  Rather, there were just allegations against him.  OSU therefore acted reasonably under the circumstances, that there were only pending allegations against Mr. Goldstein at the time.

Further, the sexual assault on Plaintiff did not occur in a context that was subject to OSU's control.  In *Murrell v. School District No. 1, Denver, Colorado*, 186 F.3d 1238, 1247 (10th Cir. 1999), the Tenth Circuit read Davis to "require that a school official who possessed the requisite control over the situation had actual knowledge of, and was deliberately indifferent to, the alleged harassment.  The circumstances in this case that lead up to the assault were not something under

OSU's requisite control.  Nor did the sexual assault occur "in the context of an educational activity."

*Simpson v. Univ. of Colorado*, 327 F. Supp. 2d 1229 (D. Col. 2005).

OSU cannot possibly be expected to control the social activities of each of its more than 50,000 students.  In this case, the assault did not take place in a classroom, during a school-sponsored event, or even while Plaintiff and Mr. Goldstein were engaged in educational pursuits. Instead, the assault took place in the early hours of the morning after Plaintiff returned from a night out drinking.  She contacted Mr. Goldstein and they agreed to meet.  While the contact between Plaintiff and Mr. Goldstein began as consensual that night, unfortunately things changed.  This, however, is not the type of context that is subject to OSU's control, nor should it be expected to be.

The Court therefore finds that OSU did not have actual knowledge of the sexual harassment or potential harm to Plaintiff prior to the sexual assault on her on February 22, 2002.  "Failure to prevent sexual harassment by a student *before it occurs* does not violate Title IX...absent a showing of an institutional policy of indifference."  *Murrell*, 186 F.3d at 1251 (emphasis in original).

**3.     Deliberate Indifference**

Even assuming Defendant OSU did have actual knowledge of the harassment, and there is not denying that they did have notice after the alleged sexual assault occurred on February 22, 2002, Plaintiff must establish that OSU acted with deliberate indifference to the known acts of harassment.  The key to this analysis is what was known to OSU at the time and whether the actions taken before and after the assault on Plaintiff were reasonable.  Plaintiff has failed to established the third element, deliberate indifference.  OSU's actions were reasonable based on the circumstances of this case, and therefore did not act with deliberate indifference to the

complaints made by Ms. Lee or Plaintiff.

The defendant/recipient of federal funds is liable for damages only where the recipient itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment.  *See Davis*, 526 U.S. at 642 (*discussing Gebser v. Lago Vista School Dist.*, stating liability arose from recipient's official decision not to remedy the violation). "The deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it."  *Davis*, 526 U.S. at 645.  The "deliberate indifference standard is a high standard that is necessary to eliminate any risk that the recipient would be liable in damages not for its own official decision but instead for its employees independent actions."  *Id.* at 643.

A recipient is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable."  *Davis*, 526 U.S. at 648-649.  The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action."  *Id.* at 648.  The standard does not mean that recipients must expel every student accused of misconduct. *See id.*  Victims do not have a right to particular remedial demands.  *See id.* Furthermore, courts should not second guess the disciplinary decisions that school administrators make. *See id.; see also Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000).

Plaintiff's primary argument in support of her claim that OSU acted with deliberate indifference is that OSU allowed Mr. Goldstein, "who had two ***allegations*** of rape against him

within a two and one-half week period, to remain on campus in the dormitories." (Pl's Memo. in Opp. at 28) (emphasis added). The problem with Plaintiff's argument is that she expected OSU to expel Mr. Goldstein based on allegations made by Ms. Lee. At the time of the sexual assault on Plaintiff, there were only allegations pending against Mr. Goldstein by Ms. Lee. Ms. Klein, who was consulting with Mr. Orefice, handled the allegations within their office of Residence Life and proceeded in accordance with University policy. Plaintiff, however, argues that this matter should have been handled in a more timely manner and referred to the Office of Student Judicial Affairs. This was, however, not the policy of the University.

There is no evidence that Student Judicial Affairs would have handled the matter any differently, or in a more timely manner. The office of Residence Life conducted a full investigation of the allegations filed by Ms. Lee. As a result of the investigation, OSU charged Mr. Goldstein with sexual misconduct and an alcohol violation under the Code on February 26, 2002. The formal hearing was held that same day. He found that Mr. Goldstein had committed sexual misconduct and violated the alcohol provision of the Code. Mr. Goldstein was placed on disciplinary probation until June 14, 2002, made his housing re-assignment permanent, and required that he be open to Ms. Lee approaching him to discuss the situation but on her own terms. The full investigation and hearing was concluded in 23 days, and there are not arguments that this was unreasonable. Further, there was no duty to warn Plaintiff, or any else, about Mr. Goldstein, as Plaintiff seems to be arguing. OSU's duties were quite the contrary, to respect the privacy and express wishes of Ms. Lee and to respect Mr. Goldstein's due process rights.

In fact, Defendant OSU argues that as of February 22, 2002, OSU was prohibited by federal law from disclosing information about Ms. Lee or Mr. Goldstein to the campus

community at large.  Except under limited exceptions which are not present in this case, FERPA

prevents the release of educational records or "personally identifiable information contained

therein...of students without the written consent of the students or their parents."  *See* 20

U.S.C.A. § 1232g; *see also United States v. Miami Univ*., 294 F.3d 797, 806 (6th Cir. 2002).

 With respect to the complaint filed by Plaintiff, she argues that the fact that OSU allowed

Mr. Goldstein to remain on campus for one and one and one-half years after the sexual assault,

deprived her of educational opportunities and benefits.  Plaintiff describes in detail how she was

deprived in stating:

> [Plaintiff] stopped going to classes and hardly left her room after the assault. She
> withdrew from her spring classes and failed a course she took during the summer
> at a community college near her home.  She was not advised of any services
> available to her to help her cope with the assault except the option of contacting
> the OSU Police.

(Pl's Memo. in Opp. at 30).

 Defendant OSU argues that it could not have acted at all, let alone with deliberate

indifference, because for three months following the assault on Plaintiff, she chose not to take

advantage of the resources readily available to her.  While the standard before the Court is

whether Defendant OSU acted with deliberate indifference with respect to the complaint of

sexual assault filed by Plaintiff, there is only so much OSU could do.  OSU made resources

available to Plaintiff that she chose not to take advantage of, but had in the past.  Specifically,

Plaintiff had taken advantage of counseling services at OSU prior to the assault, but after the

assault, she made appointments and cancelled, citing excuses not related to the assault.  Plaintiff

also had taken advantage of the hospital on OSU's campus but did not after the assault despite

telling her mother that she would go.  There were also many residence hall staff members available to go to but she did not seek help from any aside from filing the initial complaint.

It is unclear what more Plaintiff thinks OSU could have done under the circumstances. Each time she did make a request, even including the initial filing of the complaint, OSU responded accordingly.  After Plaintiff filed the report of the sexual assault, Mr. Stevenson provided Plaintiff with options, including how to proceed with counseling services, university judicial proceedings, filing a police report, and going to the hospital.  Plaintiff said she wanted to consider her options and Mr. Stevenson respected her wishes.

It was not until June 2002 that Plaintiff took advantage of any of the resources available to her.  She returned to see her counselor and she filed a police report with OSU police.  The OSU police conducted an investigation and sent a felony case summary to the Franklin County Prosecutor on September 1, 2002.  Plaintiff appears to be imputing the delay in prosecution through Franklin County to deliberate indifference by OSU.  It is true that after Plaintiff filed her police report in June 2002, her case was not presented to a grand jury until June 2003, and the case was not concluded until October 2004.  That was quite a lengthy period of time, however, that in no way can be attributed to Defendant OSU.

Plaintiff ultimately decided to take advantage of a judicial hearing at OSU, but the delay in the hearing process was completely based on Plaintiff's own actions.  She did not contact Pat Hall, the Director of Judicial Affairs, until October 2, 2002.  After this initial meeting, she waited until the end of November 2002 to contact him again.  Plaintiff made it clear that she wanted to wait until a criminal indictment was issued before proceeding with the OSU's internal hearing process.  That is exactly what Plaintiff did.  She contacted Mr. Hall on June 17, 2003,

-25-

four days after Mr. Goldstein was indicted.  Mr. Hall responded for her to schedule a meeting with him.  She again waited three weeks.  When she did call to set up the appointment, Mr. Hall made himself available to meet the next day.  The entire University proceeding was completed by September 23, 2003, less than three months after Plaintiff finally met with Mr. Hall.  The ultimate result was dismissing Mr. Goldstein from OSU.

The key to this case is that OSU is not required to "remedy" the sexual harassment nor ensure that the students conform their conduct to certain rules, but rather the Defendant "must merely respond to known peer harassment in a manner that is not clearly unreasonable."  *Davis*, 526 U.S. at 648-649.  Further, the *Davis* Court discussed that victims do not have a right particular remedial demands, nor does the deliberate indifference standard require the Defendant must expel every student accused of misconduct.  *Id.* at 648. Defendant OSU did not act in a manner that was unreasonable in responding to both Ms. Lee's and Plaintiff's complaints.  Simply because Plaintiff believes that Mr. Goldstein should have been expelled after the attack on Ms. Lee, does not mean that OSU was required to do so.  Mr. Goldstein was ultimately expelled after Plaintiff chose to proceed with the University judicial process.  The Court is not here to question each and every decision made by Defendant OSU, but simply to determine if their actions were reasonable under the circumstances.  OSU's actions were reasonable and therefore OSU did not act with deliberate indifference to the complaints made by Ms. Lee or Plaintiff.

**B.**      **State Law Claims of Negligence and Intentional Infliction of Emotional Distress**

Plaintiff asserted a claim for intentional infliction of emotional distress against The Ohio State University Board of Regents, which is an entity that does not exist and therefore the claim

was voluntarily dismissed.  Plaintiff also asserts a state law claim of negligence against Defendant OSU.  However, Plaintiff only asserts federal subject matter as the basis for this Court's jurisdiction.  Having granted summary judgment to the Defendant on the sole claim under which Plaintiff asserted federal subject matter jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim.

It is well settled that a District Court may decline to exercise supplemental jurisdiction over state-law claims once it has dismissed all claims over which it possessed original jurisdiction.  *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997).  Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state claims generally should be dismissed.  *Id.*; *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir.1992).  Therefore, pursuant to 28 U.S.C. §1367(c)(3) and (d), the Court will dismiss Plaintiff's state law claims against Defendant OSU without prejudice.

## IV.   DISPOSITION

Based on the above, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 32).

-27-

The Clerk shall enter final judgment in favor of Defendant, and against Plaintiff, dismissing this action in its entirety with prejudice.

The Clerk shall remove this case from the Court's pending cases list.

The Clerk shall remove Doc. 32 from the Court's pending motions list.

**IT IS SO ORDERED.**

 **/s/ George C. Smith**
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**